**In the United States District Court
for the District of Kansas**

———————

Case No. 22-cv-2425-TC-RES

———————

UNITED STATES OF AMERICA,
EX REL. JANICE SEGURA,

*Plaintiff*

v.

SURGICAL CARE AFFILIATES, LLC, ET AL.,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Plaintiff Janice Segura sued Surgical Care Affiliates, LLC, (SCA) and KU Medwest Ambulatory Surgery Center, LLC, for alleged false claims made to the federal government. Doc. 28. SCA and KU Medwest move jointly to dismiss for failure to state a claim. Doc. 45. For the following reasons, that motion is granted in part and denied in part.

**I**

**A**

To survive a motion to dismiss for failure to state a claim, the complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief" from each named defendant. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Two "working principles" underlie this standard. *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). First, a court ignores legal conclusions, labels, and any formulaic recitation of the elements. *Penn Gaming*, 656 F.3d at 1214. Second, a court accepts as true all remaining allegations and logical inferences and asks whether the claimant has alleged facts that make his or her claim plausible. *Id.*

A claim need not be probable to be considered plausible. *Iqbal*, 556 U.S. at 678. But the facts, viewed in the light most favorable to the claimant, must move the claim from conceivable to plausible. *Id.* at 678–80. The "mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Plausibility is context specific. The requisite showing depends on the claims alleged, and the inquiry usually starts with determining what the plaintiff must prove at trial. *See Comcast Corp. v. Nat'l Ass'n. of African Am.-Owned Media*, 589 U.S. 327, 332 (2020). In other words, the nature and complexity of the claim(s) define what plaintiffs must plead. *Cf. Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (comparing the factual allegations required to show a plausible personal injury claim versus a plausible constitutional violation).

In fraud cases, Rule 9(b) requires that plaintiffs also plead claims with "particularity," though mental conditions like intent and knowledge may be alleged generally. This requirement "afford[s] defendant[s] fair notice of . . . claims and the factual ground[s] upon which [they] are based." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018) (alteration in original) (quoting *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1172 (10th Cir. 2010)).

Although Rule 9(b)'s particularity requirement is more stringent than Rule 8(a)'s requirements, the Tenth Circuit has made clear that "claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Polukoff*, 895 F.3d at 745 (quoting *Lemmon*, 614 F.3d at 1172). Thus, for FCA claims, Rules 8(a) and 9(b) join to form the general pleading requirements. *Lemmon*, 614 F.3d at 1171. In practice, this means that FCA claims must "provid[e] factual allegations regarding the who, what, when, where and how of the alleged claims." *Lemmon*, 614 F.3d at 1172. For claims that fail Rule 9(b), courts may consider whether any deficiency resulted from the plaintiff's inability to access information in the defendant's exclusive control. *Polukoff*, 895 F.3d at 745.

**B**

Segura's claims revolve around alleged false claims in the context of medical billing to government healthcare programs. A brief primer on these programs will help contextualize the dispute.

The United States runs various healthcare programs: Tricare, Medicare, and Medicaid, among others. Doc. 28 at ¶¶ 14–20.[1] To facilitate standardized billing to those programs, the Government uses the Healthcare Common Procedure Coding System. *Id.* at ¶¶ 21, 22. This system comprises various codes, each of which identifies a medical product or service. *Id.* at ¶ 23. It is divided into three levels: Level I codes, which identify medical services and procedures furnished by medical professionals; Level II codes, which identify non-physician services; and Level III codes, which are used by state agencies and private insurers. *Id.* at ¶¶ 23–25. Relevant here are Level II codes. Those consist of a letter followed by four digits. *Id.* at ¶ 25. At issue in this suit are two Level II codes: C-codes, which refer to specific products and services, and L-codes, which refer to unspecified products and services. Doc. 28 at ¶ 25. As noted in more detail below, items with L-codes result in a higher reimbursement rate than those with a C-code.

Segura works for Surgical Care Affiliates (SCA) as a medical biller. Doc. 28 at ¶ 31. SCA, in turn, provides medical coding and billing services. *Id.* at ¶¶ 3, 31. One of SCA's clients is KU Medwest, a company that operates two surgical centers in Kansas: KU Medwest Indian Creek Ambulatory Surgical Center and KU Medwest Ambulatory Surgery Center. *Id.* at ¶ 4. Segura worked at the Indian Creek location. *Id.* at ¶ 31. As part of her work Segura is responsible for submitting Level II codes for payment to various Government programs. *Id.* at ¶ 32.

When Segura started at SCA she was taught how to use its billing system. Doc. 28 at ¶ 34. Segura was trained to only bill Level II L-codes when a patient received an implant. *Id.* SCA's billing system only permitted entry of an L-code for all implants even when a specific C-code was available. *Id.* at ¶ 41. So, for example, Segura was directed to use the L-code L8699 for various implants even though there is a specific C-code, C1713, that also applies. *Id.* at ¶ 42. Utilizing the L-code when a specific C-code exists resulted in SCA and KU Medwest

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF.

receiving a higher reimbursement rate from the Government than they would have received if they had billed the appropriate C-code. *Id.* at ¶ 40. Segura also alleges that SCA and KU Medwest are submitting the same L8699 code to seek payment for supplies that are not separately billable. *Id.* at ¶ 44. As a result, Segura alleges that SCA and KU Medwest have submitted approximately eighty improper billing entries at KU Medwest's Indian Creek location.[2] Doc. 28 at ¶ 43.

In June 2022, SCA and KU Medwest changed the billing system at the KU Medwest Indian Creek location. Doc. 28 at ¶ 47. The change prescribed the use of C-codes for implants that had previously been billed as L-codes. *Id.* When the change occurred, Segura spoke to her SCA supervisors and told them that she had been billing improper L-codes for roughly three years, and she asked whether those overbillings would be corrected. *Id.* at ¶ 48. Her supervisors replied that the change was only prospective. *Id.* Segura alleges that despite this prospective change at Indian Creek, SCA and KU Medwest are still billing improper L-codes at the other surgical center in Kansas, meaning that KU Medwest bills different codes for the same implant at different locations. *Id.* at ¶ 49. In particular, Segura alleges that SCA continues to improperly bill L-codes at roughly 220 of its centers nationwide. *Id.* at ¶ 50.

Based on these events, Segura filed suit under the False Claims Act, 31 U.S.C. §§ 3729–3733. Doc. 28. She brings three claims: Count I for knowingly presenting a false claim in violation of 31 U.S.C. § 3729(a)(1)(A), *id.* at ¶¶ 52–56; Count II for knowingly making a false statement that is material to a false claim in violation of 31 U.S.C. § 3729(a)(1)(B), *id.* at ¶¶ 57–60; and Count III for conspiracy to present a false claim in violation of 31 U.S.C. § 3729(a)(1)(C), *id.* at ¶¶ 61–69. The United States declined to intervene. Doc. 22.

---

[2] Throughout her Complaint Segura lumps SCA and KU Medwest together under the collective "Defendants," alleging that they both engaged in the conduct described. *See, e.g.*, Doc. 28 at ¶¶ 39, 40, 42 (alleging that "Defendants" improperly chose to use an L-code). SCA and KU Medwest do the same. *See, e.g.*, Doc. 45 at 13 (arguing that "nothing prohibited Defendants from billing with code L8699"). Because neither SCA nor KU Medwest has argued that it was not personally involved in the alleged upcoding scheme, that argument is not considered and it is assumed that their liability is coextensive.

SCA and KU Medwest move jointly to dismiss. Doc. 45. They argue that dismissal of Counts I and II is required because Segura failed to allege that they made a materially false statement with the requisite scienter. *Id.* at 1–14. They also argue that Count III should be dismissed because Segura failed to allege a conspiracy. *Id.* at 14.

## II

Segura adequately alleges a claim of factual falsity. But she fails to allege a conspiracy. Accordingly, the motion is granted in part and denied in part.

## A

Segura claims that SCA and KU Medwest fraudulently caused the United States to pay out sums of money in violation of the False Claims Act. Under that statute, liability extends to anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the Government, or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B).[3] To bring an FCA action, a plaintiff must allege facts that the defendant (i) made a false statement or engaged in a fraudulent course of conduct, (ii) with the requisite scienter, (iii) that is material, and (iv) that results in a claim to the Government. *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 (10th Cir. 2020). The FCA applies to Medicare and Tricare claims. *Polukoff*, 895 F.3d at 735 n.1.

Under the FCA, a complaint must provide the defendant with notice of the specific ways in which a submitted claim was false or

---

[3] A federal district court in another jurisdiction has concluded that the False Claims Act is unconstitutional because it violates the Appointments Clause. *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1324 (M.D. Fla. 2024). That holding is pending on appeal before the Eleventh Circuit, No. 24-13581. And another litigant has recently argued to the Supreme Court that the FCA violates the separation of powers. *See* Petition for Writ of Certiorari, *Eli Lilly and Company v. United States ex rel. Streck*, No. 25-1126 (filed Mar. 23, 2026). Neither party makes any constitutional arguments against the False Claims Act here. But even if they had, that argument is foreclosed by circuit precedent. *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002) (holding that the False Claims Act does not violate the Appointments Clause).

fraudulent. *Polukoff*, 895 F.3d at 745. A "false or fraudulent" claim may be either factually false or legally false. *Id.* at 741. Factually false claims involve an incorrect description of services provided (or services that were billed but never provided). *Lemmon*, 614 F.3d at 1168. Legally false claims generally involve falsely certifying compliance with a statute, regulation, or contractual provision as a condition of payment. *Id.*

False certifications may be either express or implied. *Polukoff*, 895 F.3d at 741. Express false certification occurs when a claim requestor falsely certifies compliance—as a prerequisite to payment—with a particular statute, regulation, or contractual term. *Id.* (citing *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008)). This does not require a formal certification statement, but the claims must contain express falsehoods. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1998–2001 (2016) (contrasting implied false certification with express false certification); *see also Lemmon*, 614 F.3d at 1170–72.

Implied false certifications, however, do not require courts to examine the defendant's actual statements to the Government. *Lemmon*, 614 F.3d at 1168. Instead, courts look at the underlying contracts, statutes, or regulations to determine whether compliance is a prerequisite to the government's payment. *Id.* For example, if a service provider submits a claim that includes specific representations about the services rendered—and fails to disclose noncompliance with material statutory, regulatory, or contractual requirements—the claim is legally false under a theory of implied false certification. *Escobar*, 136 S. Ct. at 2001.

A plaintiff must also establish that the defendant acted "knowingly." 31 U.S.C. § 3729(a)(1)(A)–(B). The FCA defines knowingly to "mean that a person, with respect to information[ ] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A). This knowledge, unlike other aspects of alleged fraudulent behavior, "may be alleged generally." Fed. R. Civ. P. 9(b). "Alleged generally" is less demanding than the particularity otherwise required by Rule 9(b), but these general allegations must still comply with Federal Rule of Civil Procedure 8(a). *Iqbal*, 556 U.S. at 686–87. And Rule 8(a) requires more than "plead[ing] the bare elements" of a claim. *Id.* at 687.

6

Finally, a plaintiff must show that a falsehood was "material" to the government's payment. A knowingly false claim is considered material when it has "a natural tendency to influence, or [is] capable of influencing, the payment . . . of money." 31 U.S.C. § 3729(b)(4). This inquiry is often holistic, looking to the effect on the behavior of the government entity receiving the misrepresentation. *Escobar*, 136 S. Ct. at 2002. Where FCA liability is based on noncompliance with regulatory or contractual provisions, relevant factors include (i) whether the government consistently refuses to pay similar claims based on the noncompliance, or whether the government continues to pay claims despite knowledge of the noncompliance; (ii) whether the noncompliance goes to the "very essence of the bargain" or is only "minor or insubstantial"; and (iii) "whether the government has expressly identified a provision as a condition of payment." *Janssen*, 949 F.3d at 541 (citing *Escobar*, 136 S. Ct. at 2003 & n.5).

**B**

**1.** SCA and KU Medwest generally assert that dismissal of Counts I and II are required because Segura's Complaint does not allege falsity. Doc. 45 at 8. Not so.

The facts pleaded by Segura, taken as true, make out a plausible allegation that SCA and KU Medwest submitted a factually false claim.[4] *Contra* Doc. 45 at 10. In particular, she alleges that SCA and KU Medwest submitted an incorrect description of the goods they provided: They submitted L-codes for unidentified products even though the products *were* identified by a C-code. Doc. 28 at ¶ 42; *see Lemmon*, 614 F.3d at 1168 ("Claims arising from factually false requests generally require a showing that the payee has submitted an incorrect description of goods or services provided . . . .") (quotation marks omitted). This was material because it affected the Government's payment decision insofar as SCA and KU Medwest received reimbursements higher than those to which they were entitled. Doc. 28 at ¶ 43 (alleging roughly $267,000 in overpayments); *cf. Janssen*, 949 F.3d at 543 (finding that a false claim was not material because it was unlikely to "affect the Government's payment decision"). Segura informed her supervisors about this issue, but they took no corrective action at other KU Medwest locations. Doc. 28 at ¶¶ 48, 49; *see Lemmon*, 614 F.3d at 1169 (reversing the district court's dismissal where the plaintiffs alleged, *inter alia*, that the defendant knew about the false claims because the plaintiffs informed them of that fact). These allegations provide an adequate basis for a plausible inference that SCA and KU Medwest submitted a false claim. *See Lemmon*, 614 F.3d at 1173 (reversing the district court's dismissal because the plaintiffs met their burden of pleading sufficient

---

[4] Segura does not explain whether she is pursuing a claim of legal falsity or factual falsity. *See United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co., Inc.*, 48 F.4th 1146, 1151 (10th Cir. 2022) ("A false claim within the meaning of § 3729(a)(1) can be either factually false or legally false."). Based on a review of Segura's Complaint and her response to the motion to dismiss, Docs. 28 and 46, it does not appear that she is pursuing a claim of legal falsity because she failed to allege that SCA and KU Medwest certified compliance with a statute or regulation as a condition of payment. *See Sorenson*, 48 F.4th at 1158 (affirming the district court's finding that a complaint did not satisfy the FCA's materiality standard where it asserted nothing more than a naked violation of federal law); *cf. Lemmon*, 614 F.3d at 1169 (finding that a complaint contained sufficient allegations to support legally-false claims where the plaintiffs "documented a series of instances in which they personally observed [the defendant] *violate its contractual and statutory obligations*") (emphasis added). Moreover, she did not suggest or argue that her claim of legal falsity is for either an express or implied false certification. *See United States v. The Boeing Co.*, 825 F.3d 1138, 1148 (10th Cir. 2016) (explaining that "there are two forms of legally false certification—express and implied"). As a result, her claim is construed as only asserting a claim for factual falsity.

detail to support "a plausible inference that false claims were submitted") (citations omitted).

SCA and KU Medwest make three counterarguments, but none are persuasive. First, they allege that Segura is wrong in suggesting that the L-codes they submitted were improper. Doc. 45 at 11, 13–14. That position may ultimately be vindicated by proof that their submissions were not incorrect. But it is improper at this procedural stage to consider a factual universe inconsistent with what is alleged in the Complaint; district courts must accept all well-pleaded allegations as true. *Penn Gaming*, 656 F.3d at 1214.

Second, they argue that Segura's allegations fail to plead fraud with the particularity that Rule 9(b) requires. Doc. 45 at 12. Generally speaking, "Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how' of the alleged fraud." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006), *abrogated on other grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019). Segura's Complaint adequately satisfies this standard. She alleges that SCA and KU Medwest (who), Doc. 28 at ¶¶ 49, 50, submitted false claims for payment by improperly using L-codes (what), *id.* at ¶ 42, beginning as early as 2021 and continuing to this day (when), *id.* at ¶¶ 42, 50, at KU Medwest's Kansas locations and SCA's locations nationwide (where), *id.* at ¶¶ 49, 50, by training medical billers like herself to use L-codes instead of the appropriate C-codes and preventing them from entering C-codes (how), *id.* at ¶¶ 34, 39, 41. *See Lemmon*, 614 F.3d at 1172 (reversing the lower court's dismissal after walking through how the plaintiffs satisfied their Rule 9(b) burden). Again, these allegations may ultimately find no support once discovery concludes, but they must be accepted at the Rule 12 stage.

Third, SCA and KU Medwest argue that Segura failed to properly allege scienter. *Contra* Doc. 45 at 12. They argue that "code L8699 is an accurate description to use when billing implantable devices," and therefore the fact that they changed their billing practices "does not support an improper intent because nothing prohibited Defendants from billing with code L8699." *Id.* at 13. But Segura has alleged that SCA changed its billing practices at KU Medwest's Indian Creek location, that she informed her supervisors that she had been billing improperly for years, that SCA continues to bill improperly at KU Medwest's Ambulatory Surgery Center, and that SCA continues to bill improperly at its facilities nationwide despite her statements and their changed practice at the Indian Creek location. Doc. 28 at ¶¶ 47–50.

9

These allegations establish that KU Medwest is acting with reckless disregard, if not with actual knowledge, of the falsity of the claims it submits because it has different billing practices at two of its surgery centers in Kansas. The allegations similarly establish SCA's reckless-ness or actual knowledge given that it has different billing practices nationwide. *See* 31 U.S.C. § 3729(b)(1)(A) (requiring "actual knowledge" or "reckless disregard"); *cf. United States v. Boeing Co.*, 825 F.3d 1138, 1149 (10th Cir. 2016) (affirming summary judgment for the defendant where the plaintiff offered no evidence that the defendant knew about the false claim).

**2.** SCA and KU Medwest also argue that Count III should be dis-missed because Segura has failed to allege a conspiracy. Doc. 45 at 14. They are correct.

The False Claims Act imposes liability on anyone who conspires to submit a false claim. 31 U.S.C. § 3729(a)(1)(C); *United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co.*, 48 F.4th 1146, 1151(10th Cir. 2022). The elements of such a claim are an agreement to make a false claim and an overt act taken toward that purpose. *United States ex rel. Schroeder v. Hutchinson Reg'l Med. Ctr.*, 777 F. Supp. 3d 1256, 1283 (D. Kan. 2025); *accord United States ex rel. Angelo v. Allstate Ins. Co.*, 106 F.4th 441, 452 (6th Cir. 2024) (noting that for conspiracy claims under the False Claims Act, "as with any conspiracy, there must be plausible facts alleging an agreement"). It is not enough that the conspirators had an agreement that had the effect of defrauding the Government. *Allison Engine Co. v. United States. ex rel. Sanders*, 553 U.S. 662, 672 (2008). Ra-ther, "it must be shown that the conspirators intended to defraud the Government." *Id.* (quotation marks omitted).

Segura's Complaint falls short of that standard. *Contra* Doc. 46 at 14. Nowhere does she allege that SCA and KU Medwest entered into an agreement in order to defraud the Government. *See Angelo*, 106 F.4th at 452 ("[I]t is not enough for relators to show there was an agreement that made it *likely* there would be a violation of the FCA; they must show an agreement was made *in order to* violate the FCA.") (emphasis in original). Her only allusion to an agreement is to note that SCA and KU Medwest "entered into an agreement and plan to con-spire to violate the FCA . . . ." Doc. 28 at ¶ 64; *see* Doc. 46 at 15 (argu-ing that "[b]y acting together to utilize a system and process of illegal upcoding . . . the Defendants are put on notice of a plausible agree-ment existing"). That is not an allegation of fact; it is "a formulaic rec-itation of the elements of a cause of action" that, as the Supreme Court

10

noted, "will not do." *Iqbal*, 556 U.S. at 678. "Relators must allege who was party to the agreement, how the agreement was reached, when the agreement was reached, and what were its terms." *Angelo*, 106 F.4th at 452. Segura has not done so.

Segura's argument to the contrary is unavailing. *Contra* Doc. 46 at 15. She notes that her allegations of SCA and KU Medwest's "joint knowledge and wrongdoing" satisfy her burden to plead a conspiracy because "[b]y acting together . . . the Defendants are put on notice of a plausible agreement existing . . . ." *Id.* This argument is a *non sequitur.* If the existence of an agreement could be inferred solely from joint conduct, then the requirement to plead an agreement would be tooth-less. *See Schroeder*, 777 F. Supp. 3d at 1283 ("The elements of an FCA conspiracy claim are [1] an agreement to get false claims paid . . . .") (alterations in original); *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 917 (6th Cir. 2017) (affirming the lower court's dis-missal of a conspiracy claim because there were "insufficient allega-tions to show there was a plan to get false claims paid"). But even if an agreement could be inferred merely from joint conduct, her claim still fails because she has not alleged that any agreement was made to de-fraud the Government. *See Allison*, 553 U.S. at 672 ("[I]t is not enough for a plaintiff to show that the alleged conspirators agreed upon a fraud scheme that had the effect of causing a private entity to make payments using money obtained from the Government. Instead, it must be shown that the conspirators intended to defraud the Government.").

## III

For the foregoing reasons, SCA and KU Medwest's Motion to Dis-miss, Doc. 45, is GRANTED in part and DENIED in part.

It is so ordered.

Date: March 30, 2026            s/ Toby Crouse
                                Toby Crouse
                                United States District Judge

11